UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

JORGE VILLALOBOS and CINDY MARTINEZ,

                        Plaintiffs,

                                                          20-cv-9736 (PKC)
           -against-
                                                          OPINION AND ORDER

CAPTAIN SMITH, CAPTAIN OLOGUN,
DEPUTY WARDEN SHARLISA WALKER,
OFFICER SMALL, CITY OF NEW YORK, and
JOHN AND JANE DOE 1-10,

                        Defendants.

----------------------------------------------------------------x

CASTEL, U.S.D.J.

           Plaintiff Jorge Villalobos, a physician assistant at Rikers Island, alleges that he

was kidnapped and taken hostage by non-party Peter Rodriguez, an inmate at Rikers Island.

According to Villalobos, in the presence of correctional officers, Rodriguez repeatedly

threatened Villalobos's life during an approximately three-hour period.  Villalobos alleges that

the correctional officers named in this action helped create and prolong the hostage situation,

first by failing to properly restrain Rodriguez, and then by failing to call the Emergency Services

Unit once he was taken hostage.

           Villalobos and plaintiff Cindy Martinez, his wife, now bring claims against

defendants the City of New York (the "City"), and officers Captain Paul Smith, Captain Oladapo

Ologun, Deputy Warden Sharlisa Walker, Officer Durell Small and John and Jane Doe 1-10 of

the City's Department of Corrections ("DOC").[1]  First, Villalobos brings a section 1983 claim

---

[1] To date, no John or Jane Doe defendant has been identified and none have been served.  The time for doing so has
expired under Rule 4(m), Fed. R. Civ. P.  Plaintiffs are on notice that the Court will dismiss the John Doe defendants

against Smith, Ologun, Walker and Small, asserting that their conduct deprived Villalobos of a substantive due process right, specifically, his right protected under the Fourteenth Amendment to the United States Constitution to be free from state-created dangers.  42 U.S.C. § 1983.  (Am. Compl. ¶¶ 120-53.)  No federal claim is asserted against the defendant City.  Second, Villalobos asserts a New York state negligence claim against all defendants, including the City.  (Id. ¶¶ 154-185.)  Third, Cindy Martinez asserts a state law claim for loss of consortium, services, support, society and companionship against all defendants stemming from the impact of Villalobos's injuries allegedly caused by defendants.  (Id. ¶¶ 186-92.)  Defendant City and the four named DOC officer defendants now move to dismiss the Amended Complaint under Rule 12(b)(6), Fed. R. Civ. P.  (Doc 38, 41.)

As will be explained, viewed in a light most favorable to Villalobos, he has plausibly alleged a claim for relief under section 1983 against defendants Smith, Ologun and Small but not as to Deputy Warden Walker, who was not personally involved in the events giving rise to liability.  As to the state law claims, the Court will continue to exercise supplemental jurisdiction under 28 U.S.C. § 1367.  The Court also concludes that the state law claims against Walker and Ologun are not time-barred and that Villalobos's lack of physical injury does not preclude Martinez's loss-of-consortium claims under New York law.

Defendants' motions to dismiss will be granted in part and denied in part.

BACKGROUND

The Court summarizes the Amended Complaint's factual allegations, and, for the purposes of the motion, accepts them as true, drawing all reasonable factual inferences in favor

---

at the expiration of seven days from the issuance of this Opinion and Order.  For the purposes of this Opinion and Order, "defendants" will refer to the moving defendants: the City, Smith, Ologun, Walker and Small.

of the plaintiffs as the non-movants.  See In re Hain Celestial Grp., Inc. Sec. Litig., 20 F.4th 131,

133 (2d Cir. 2021).

On September 24, 2019, Villalobos, then 58 years old, was working as a

physician assistant and administering medical treatment to inmates on Rikers Island at the

medical clinic in the George R. Vierno Center ("GRVC"), a housing unit within Rikers Island

(Am. Compl. ¶¶ 1, 29.)  At the time, Villalobos had served as a physician assistant at Rikers for

29 years.  (Id. ¶ 30.)  On the date of the incident, Villalobos was assigned to a rotation at the

GRVC's "11 mini clinic," which was used to provide medical care to segregated inmates housed

in the central punitive segregation unit and was known to be frequented by dangerous and

potentially violent inmates.  (Id. ¶¶ 32-33.)

The mini clinic consists of three parts separated by walls with doors: a waiting

area, an examining room, and a nursing station.  When inmates come in for examination, they

come to the waiting area where there are three holding pens, a desk for correctional officers, and

a door connecting the waiting area to the examining room, which is itself connected by a door to

the nursing station, which is only accessible to medical personnel and not to inmates.  (Id. ¶¶ 36-

39.)  The nursing station has a large plexiglass window so that one can see the examining room

through it, and vice-versa.  (Id. ¶ 39.)

At around noon, inmate Peter Rodriguez was escorted into the waiting area,

accompanied by correctional officers Smith, Ologun and Small.  (Id. ¶¶ 40, 46-49.)  Rodriguez

was a pre-trial detainee at the GRVC awaiting trial for allegedly stabbing and killing his

roommate over rent money.  (Id. ¶ 41.)  Rodriguez was also known to be a highly dangerous

individual who had assaulted members of the medical staff on Rikers Island, putting a physician

in a headlock and "sucker punching" another physician assistant, and this reputation was

allegedly known by the three officers.  (Id. ¶ 42.)  When Rodriguez was brought into the mini clinic waiting area, he was handcuffed, but without shackles around his waist or ankles, even though as an inmate designated for the central punitive segregation unit, Rodriguez was required to be shackled around his waist—his hands then cuffed to his waist shackles—and shackled around his ankles when being brought to the clinic for examination.  These DOC protocols were not followed when the Smith, Ologun and Small brought Rodriguez to the mini clinic on the day of the incident.  (Id. ¶¶ 44-45.)  Instead, defendants Smith and Ologun placed him on an examining table in the examination room, with one hand cuffed to the wall bar.  (Id. ¶ 46.)  Villalobos performed a medical assessment on Rodriguez, who did not exhibit visible signs of injuries, filled out a report and handed the report to Small.  (Id. ¶ 47.)

Following the medical assessment, Rodriguez got into a heated argument with DOC staff members, including Smith, Ologun and Small, making demands for sneakers and other items and stating that he would not return to his housing area unless his demands were met. (Id. ¶ 48.)  At this point, Small instructed Rodriguez to step into the holding pen in the waiting area at the mini clinic, as required by safety protocols.  (Id. ¶ 49.)  But Rodriguez refused, stating, "I'm not going in there.  You know who I am."  Instead of securing compliance with their instructions, Smith, Ologun and Small allegedly acquiesced and allowed Rodriguez to roam around outside the holding pen without the proper restraints.  (Id. ¶¶ 50-51.)

After Villalobos attended to a second inmate at the mini clinic, DOC staff, including Captain Smith, Captain Ologun and Officer Small, let Rodriguez back into the examining room and placed him on the examining table again.  In so doing, Smith, Ologun and Small violated internal DOC safety protocols by failing to return Rodriguez to his housing area or, at a minimum, keep him restrained in the holding pen in the waiting area.  (Id. ¶ 53.)  In

4

contrast, the other inmates Villalobos attended to that day, including the second examined inmate, were promptly escorted out of the clinic after their examinations.  (Id. ¶ 54.)

Villalobos verbally expressed his discomfort at Rodriguez's refusal to leave and requested that Rodriguez be escorted out of the mini clinic before Villalobos would see his third inmate patient for the day.  Villalobos informed Smith, Ologun and Small that he would go to a different clinic for a few minutes to lock it and would return to the 11 mini clinic to see if the area was clear of Rodriguez so he could see the next patient.  (Id. ¶ 55.)  Smith, Ologun and Small, however, allegedly ignored Villalobos' concerns and instead allowed Rodriguez to remain without restraints other than his front-cuffs.  As a result, when Villalobos returned to the 11 mini clinic, he found Rodriguez still in the examining room on the examining table, under less supervision—Small had left the mini clinic in Villalobos's absence.  According to the allegations, the remaining Captain Smith and Captain Ologun were sitting together in the waiting area, appearing relaxed and talking to each other without paying any attention to Rodriguez, who was still not shackled around his waist and ankles, and at this point, not restrained to a wall post as he had been previously.  (Id. ¶¶ 56-59.)

Villalobos asked Smith and Ologun why Rodriguez was still at the 11 mini clinic and where his third patient was.  Smith allegedly responded that the third patient had already left and that Rodriguez would leave in a few minutes.  When Villalobos expressed his safety concerns, Smith and Ologun dismissed them and told Villalobos not to worry.  (Id. ¶¶ 60-61.)  In response, Villalobos went into the nursing station of the 11 mini clinic to call and inform a DOC administrator or supervisor that Rodriguez was still in the clinic and refusing to leave. Allegedly, no one picked up Villalobos's call.  (Id. ¶ 66.)

At approximately 1 p.m., when Villalobos hung up the phone and turned around, he found Rodriguez standing right behind him in the nursing station, asking for a glass of water. According to the allegations, Smith and Ologun, who were still in the medical clinic, did not interfere or seek to restrain Rodriguez, who had found his way to the innermost part of the clinic with Villalobos.  (Id. ¶ 67.)  When Villalobos told Rodriguez that he could not be in the nursing station and told him to leave the area, Rodriguez pushed Villalobos, took Villalobos's keys and locked the door connecting the examining room and the nursing station, barricading himself in the nursing station with Villalobos.  (Id. ¶¶ 68-69, 72.)

Upon being locked in with Rodriguez, Villalobos started banging on the Plexiglass window between the nursing station and the examining room to catch Ologun and Smith's attention.  Meanwhile, Rodriguez was barricading the entrance of the nursing station with a desk and other medical equipment.  (Id. ¶ 71.)  Smith and Ologun responded by asking Villalobos to open door, to which Villalobos replied that he was obviously unable to open the door because Rodriguez was blocking the entrance and had the keys.  (Id. ¶ 73.)

Several DOC officers then rushed into the area and unsuccessfully attempted to verbally persuade Rodriguez to open the door to the nursing station.  (Id. ¶ 74.)  Allegedly, none of the DOC officers, including the individual defendants, initially called the Emergency Service Unit ("ESU"), which was the proper protocol for immediately defusing a volatile and high-risk situation.  (Id. ¶ 75.)  According to the Amended Complaint, once the ESU is called per DOC protocols, the incident is widely known and representatives of the City, including the mayor, are notified and potentially become involved.  (Id. ¶ 84.)  Allegedly, Smith and Ologun, along with other DOC officers, attempted to handle the negotiation with Rodriguez without involving the ESU for a significant period of time.  For example, a nurse from the GRVC main clinic, known

as Nurse Razak, called the nursing station twice to speak to Rodriguez, who then mocked the nurse, told her that she was a "bad negotiator," and hung up the phone.  Nurse Razak is alleged not to have any training, education, or qualification to engage in such a hostage negotiation, and Villalobos felt that her failures and the DOC officers' loud arguments with Rodriguez would further agitate Rodriguez and endanger Villalobos himself.  (Id. ¶¶ 84-86.)  In fact, Rodriguez himself made several verbal requests for the Smith and Ologun to call the ESU because he wanted to convey his demands to the ESU directly, but they allegedly refused.  (Id. ¶ 87.)

Villalobos alleges that for the next three hours, Rodriguez continued to hold him hostage in the nursing station, during which Smith, Ologun and Walker, present at the scene at various times, refrained from intervening directly and also refused to call the ESU.  (Id. ¶¶ 76-77, 82.)  For example, at around 2 p.m., approximately an hour into the crisis, defendant Walker, the deputy warden, showed up in person to assess the situation.  Villalobos observed that Walker was acting in a nonchalant manner, with hands in her pockets, looking at Villalobos and Rodriguez in the nursing station through the Plexiglass window.  After speaking with DOC officers, Walker left the clinic, without attempting to engage with Villalobos or Rodriguez in any way.  (Id. ¶ 83.)

During the three hours in which Rodriguez held Villalobos hostage, Rodriguez made numerous threats to kill, assault, bite and otherwise gravely injure Villalobos.  For example, Rodriguez specifically threatened to "chew [Villalobos's] face off, and that he would use an oxygen tank, which he had placed on a desk, "to smash the doctor's head," and announce that it would be the individual defendants' fault that Villalobos would get hurt.  (Id. ¶ 78.)  Rodriguez also shouted threats, including that he was "going to f—k this guy up" and that he "don't care if I kill [Villalobos]."  (Id. ¶ 79.)  At one point, Rodriguez asked Villalobos where the

scalpels were, to which Villalobos responded that they do not carry any sharp instruments in the mini clinic.  Rodriguez proceeded to search around the nursing station looking for scalpels, ripping off computer wires and electrical cables, threatening Villalobos by telling him, "you better be right or you are going to regret it."  (Id. ¶ 80.)  Contrary to what Villalobos told his captor, there were indeed scalpels in the nursing station.  (Id. ¶ 39.)  During his captivity, Villalobos feared for his life and prayed that he would die quickly, as he observed Rodriguez grow increasingly agitated, hostile and volatile.  (Id. ¶¶ 80-81.)

Finally, at around 3 p.m. or 4 p.m., a member of the ESU team arrived and informed Rodriguez that unless he opened the door within 30 seconds, they would bring the door down.  Rodriguez complied within a few minutes, and Villalobos was able to leave the nursing station, shaking, short of breath, unable to speak, and with a blood pressure measured at 188/122.  (Id. ¶¶ 83, 88-90.)

As a result of the incident, Villalobos suffers from debilitating post-traumatic stress disorder associated with flashbacks, panic attacks, anxiety, nightmares, sleep disturbances and hypervigilance.  (Id. ¶ 93.)  He finds himself living in constant fear—to the extent of being afraid to close the bathroom door while showering—as well as feeling aloof and disconnected even when he is with his family.  (Id.)  He also alleges that he has lost his sex drive, which has affected his relationship with his wife, Martinez.  (Id.)  Between September 25, 2019 and April 1, 2020, Villalobos exhausted his accumulated sick days and took a medical leave of absence.  (Id. ¶ 94.)  He returned to work on April 1, 2020 as the sole income-earner of his family, but in a limited role as a telehealth provider overseeing nurses, as he can no longer interact with patients due to his post-traumatic stress disorder.  (Id.)  Following this incident, the City suspended Smith and Ologun.  (Id. ¶ 115.)

MOTION TO DISMISS STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Legal conclusions are not entitled to the presumption of truth, and a court assessing the sufficiency of a complaint disregards them.  Iqbal, 556 U.S. at 678.  Instead, the Court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  A complaint must include non-conclusory factual allegations that "'nudge[]'" its claims "'across the line from conceivable to plausible.'"  Id. at 680 (quoting Twombly, 550 U.S. at 570).

In addition to the complaint's allegations, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

DISCUSSION

A.    Section 1983 Claims

The Court concludes that Villalobos has plausibly pled under section 1983 that Smith, Ologun and Small violated his right to substantive due process under the state created danger doctrine that Villalobos expressly invokes.  (Am. Compl. ¶¶ 120-21.)  The Court concludes that Villalobos has failed to plead a section 1983 claim against Walker.

i.    <u>Applicable Law</u>

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."  42 U.S.C. § 1983.  An individual may be held liable under section 1983 "only if that individual is 'personally involved in the alleged deprivation.'"  <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 314 (2d Cir. 2015) (quoting <u>Back v. Hastings On Hudson Union Free Sch. Dist.</u>, 365 F.3d 107, 126 (2d Cir. 2004)).  As relevant here, "[p]ersonal involvement can be established by showing that . . . the defendant participated directly in the alleged constitutional violation."  <u>Id.</u>

"Although '[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause,' state actors may be liable under section 1983 if they affirmatively created or enhanced the danger of private violence."  <u>Okin v. Vill. of Cornwall-On-Hudson Police Dep't</u>, 577 F.3d 415, 427-28 (2d Cir. 2009) (quoting <u>DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 197 (1989) and citing <u>Dwares v. City of New York</u>, 985 F.2d 94, 99 (2d Cir. 1993)).  "[T]hough an allegation simply that . . . officers had failed to act upon reports of past violence would not implicate the victim's rights under the Due Process clause, an allegation that the officers in some way had assisted in creating or increasing the danger to the victim would indeed implicate those rights."  <u>Okin</u>, 577 F.3d at 428 (quoting <u>Dwares</u>, 985 F.2d at 99).

In conducting this analysis, the Second Circuit has held that "the Due Process Clause may be violated when . . . officers' *affirmative* conduct—as opposed to *passive* failures to

act—creates or increases the risk of private violence, and thereby enhances the danger to the victim." Id. (emphases in original). "[W]here the state actors actually contributed to the vulnerability of the plaintiff, or where the state actors aided and abetted a private party in the deprivation of a plaintiff's civil rights, a violation of the Due Process Clause does occur." Id.

The Second Circuit has also found that "repeated, sustained inaction by government officials in the face of potential acts of violence, might constitute 'prior assurances,' . . . rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." Id. (quoting Dwares, 985 F.2d at 99). For example, when "state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct under Dwares. This is so even though none of the defendants [is] alleged to have communicated the approval directly." Id. (quoting Pena v. DePrisco, 432 F.3d 98, 111 (2d Cir. 2005)). In other words, "the Due Process Clause could be violated by [state officials'] implicit message that they condoned" the private actor's misconduct, which was likely to endanger the life, liberty or property of others. Id.

In addition, "[t]o establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Okin, 577 F.3d at 428 (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998), *abrogated on other grounds by* Saucier v. Katz, 533 U.S. 194 (2001)). Notably, it is the action of the state actor, not the private party directly inflicting the harm, that is the focus of this inquiry.

11

"'[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process,' but 'injuries . . . produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls.'" Bolmer v. Oliveira, 594 F.3d 34, 142-43 (2d Cir. 2010) (quoting Lewis, 523 U.S. at 849). "Deliberate indifference that shocks in one environment may not be so patently egregious in another," and the Supreme Court has instructed that the "concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." Lewis, 523 U.S at 850. For example, the Supreme Court has distinguished situations like "high-speed law enforcement chases," from "the custodial situation of a prison, [where] forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." Id. at 851. In interpreting Supreme Court precedent, the Second Circuit has emphasized the importance of recognizing situations where government officials "were subjected to the 'pull of competing obligations,'" Matican v. City of New York, 524 F.3d 151, 159 (2d Cir. 2008), because when "great harm is likely to befall someone no matter what a government official does, the allocation of risk may be a burden on the conscience of the one who must make such decisions, but does not shock the contemporary conscience." Id. (holding that officers' decision to use force in the arrest of a "potentially violent drug dealer" did not "shock the conscience" because the officers "were obliged to protect their own safety as well as [the plaintiff's]").

ii.   <u>Application</u>

As alleged in the Amended Complaint, Smith, Ologun and Small's conduct both preceding and during the hostage taking is deeply troubling and raises serious and legitimate concerns about their failure to follow DOC's internal protocols that are intended to protect the physical well-being of the medical staff.  Of course, violation of internal protocols does not equate with a constitutional violation and, indeed, compliance with protocols does not foreclose a finding that a constitutional right was violated.  <u>See</u> <u>e.g.</u>, <u>Collado v. City of New York</u>, 2017 WL 4533772, at *3 (S.D.N.Y. Sept. 27, 2017) (Batts, J.) (noting that "[a]lthough a violation of [department protocol] is not necessarily a violation of constitutional rights just as a violation of constitutional rights is not necessarily a violation of [department protocol]," such protocol "is relevant in determining how a reasonable officer might comport himself under the circumstances.")  The Court concludes at the pleading stage that if the facts alleged were proven, a reasonable factfinder could conclude that the Smith, Ologun and Small's failures to properly restrain and supervise Rodriguez may have had the effect of "creating or increasing the danger" posed by Rodriguez to Villalobos—because Rodriguez was not properly restrained or supervised, he was able to enter the nursing station and take Villalobos hostage.  The alleged actions of these officers in allowing Rodriguez to roam freely in the mini clinic and later the nursing station could lead a factfinder to conclude that they amounted to more than "fail[ures] to act upon reports of past violence," such as reports of Rodriguez's assaulting medical staff.  <u>Okin</u>, 577 F.3d at 428.

To succeed in arguing that Smith, Ologun and Small's inaction amounted to a deprivation of his substantive due process rights under the state created danger doctrine, Villalobos must show that the "repeated, sustained inaction by government officials in the face

13

of potential acts of violence," "constitute[d] 'prior assurances,' rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." Okin, 577 F.3d at 428. In other words, Villalobos must allege that the Smith, Ologun or Small "communicate[d], explicitly or implicitly, official sanction of private violence." Id. at 429 (citing Pena, 432 F.3d at 111, Hemphill, 141 F.3d at 419, Dwares, 985 F.2d at 99).

This case does not neatly fit the contours of other cases successfully invoking the doctrine, but three interrelated allegations help nudge this complaint over the plausibility hurdle. First, the Amended Complaint implicitly alleges that the individual officers acceded to Rodriguez's threats of violence directed to them. When Small directed Rodriguez to enter the holding pen in the waiting area at the mini clinic, Rodriguez refused, stating "I'm not going in there. You know who I am." (Am. Compl. ¶ 50.) If competent evidence of the remark were introduced at trial, a reasonable fact finder could conclude that it was a threat that he, Rodriguez, would forcibly resist efforts by the officers to force him into the pen and thereby expose the officers to a risk of injury. In violation of the protocols, the officers did not force him into the pen thereby increasing the risk of harm of Villalobos. Second, when Villalobos expressed his discomfort with Rodriguez's continued presence at the nursing station, Smith and Ologun dismissed them and told Villalobos not to worry. (Id. ¶¶ 60-61.) Third, while the officers on the scene knew that the ESU could and should be called to the scene once Villalobos was taken hostage by Rodriguez, they refrained from doing so. A reasonable fact finder could conclude that this was more than passive inaction but a conscious choice not to elevate the visibility of the incident and thereby expose their earlier failure to properly restrain and supervise Rodriguez.

The Court concludes that if these interrelated allegations were proven at trial, a reasonable factfinder could conclude that the officers' continued inaction and failure to properly

restrain and supervise Rodriguez conveyed an official sanction of Rodriguez's decision to remain in and wander around the mini clinic—a sanction which Rodriguez procured with implied threats of violence against the officers and led directly to his holding Villalobos against his will behind a locked door.[2]  Like in Okin, where the Second Circuit noted that a "reasonable factfinder undoubtedly could conclude that defendants . . . conveyed to [the aggressor] that he could continue to engage in domestic violence with impunity," Okin, 577 F.3d at 430-31), here a reasonable factfinder could conclude that Smith, Ologun and Small implicitly conveyed to Rodriguez their acquiescence to his acting out and roaming around a restricted area in the presence of vulnerable medical staff, and that this conveyance, coupled with the officers' knowledge of his reputation for violence, including prior acts of violence against medical staff, amounts to condonation of private violence within the meaning of Okin.

A reasonable factfinder, if the allegations were proven, could also conclude that the conduct of Smith, Ologun and Small "shocks the contemporary conscience."  Okin, 577 F.3d at 428.  At trial, Villalobos may prove that Smith, Ologun and Small knew that Rodriguez had been charged with stabbing his roommate to death and had assaulted multiple medical staff at Rikers Island.  This knowledge, coupled with the decision to restrain Rodriguez with only front handcuffs and to allow him to roam freely about the medical clinic, resulting in the inmate taking a 58-year-old hostage for three hours in a locked room, and the fact that Smith and Ologun delayed notifying the ESU who could have brought the incident to an early end, could support a finding that the officers' actions shock the contemporary conscience.

---

[2] The Court need not decide at the pleadings stage whether Small's departure before the actual hostage taking breaks the chain of causation for the consequences of the hostage taking.

At the pleading stage, drawing reasonable inferences in favor of Villalobos as the non-movant, Villalobos's allegations meet the requirements of the state created danger doctrine and he has stated a plausible claim to relief under section 1983 against Smith, Ologun and Small.

> iii.    Qualified Immunity Defense for Smith, Ologun and Small

Based on the allegations of the Amended complaint, the Court concludes that at the current motion-to-dismiss stage, defendants Smith, Ologun and Small have failed to establish a defense of qualified immunity.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Mullenix v. Luna, 577 U.S. 7, 11 (2015) (quoting Pearson v. Callahan, 55 U.S. 223, 231 (2009)).  "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  Id. (quoting Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)).  In so reviewing, courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  Id.  (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).  "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality."  Id. (quoting al-Kidd, 563 U.S. at 742).  In the Second Circuit, "[w]e look to Supreme court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right," here, on September 24, 2019.  Okin, 577 F.3d at 433.  Courts may also examine "statutory or

administrative provisions in conjunction with prevailing circuit or Supreme Court law to determine whether an individual had fair warning that his or her behavior would violate the victim's constitutional rights."  Id. at 433-34.  As early as 2009, the Second Circuit has held that circuit precedent "gave notice of the rule that a police officer can violate a person's due process rights by affirmatively creating or increasing the risk of private violence against that person," and that "the state-created danger theory . . . [had] clearly established that police officers are prohibited from affirmatively contributing to the vulnerability of a known victim by engaging in conduct, whether explicit or implicit, that encourages *intentional* violence against the victim." Id. at 434 (emphasis in original).

As relevant here, on a motion to dismiss, a qualified immunity defense "'faces a formidable hurdle . . .' and is usually not successful."  Field Day, LLC v. Cnty. of Suffolk, 463 F.3d 167, 191-92 (2d Cir. 2006) (quoting McKenna v. Wright, 386 F.3d 432, 434 (2d Cir. 2004)).  "Dismissal under Rule 12(b)(6) is only appropriate if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to belief.'"  Id. at 192.

As noted, by September 24, 2019, it was "clearly established that police officers are prohibited from affirmatively contributing to the vulnerability of a known victim by engaging in conduct, whether explicit or implicit, that encourages *intentional* violence against the victim." Okin, 577 F.3d at 434 (emphasis in original).  Although Smith, Ologun and Small were correctional officers, not police officers, the Supreme Court has "ma[de] clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances . . . . [T]he salient question . . . is whether the state of the law in [2019] gave [them] fair

17

warning" that their alleged treatment of Villalobos was unconstitutional.  Hope v. Pelzer, 536 U.S. 730, 741 (2002).

At the motion-to-dismiss stage, individual defendants face a "formidable hurdle" for establishing a qualified immunity defense, Field Day, 463 F.3d at 191-92. Drawing all reasonable inferences in favor of Villalobos as the non-movant, the Court concludes that Smith, Ologun and Small were on notice that their actions violated Villalobos's clearly established right to be free from state-created danger.

Accepting the allegations of the Amended Complaint as true, it is "hard to fathom" how a reasonable official in Smith, Ologun and Small's shoes could have believed that he was acting in a constitutionally permissible fashion.  Id. at 195.  To be specific, in leading up to the hostage situation, Smith, Ologun and Small: (1) brought a "dangerous inmate" (City Br. at 18) awaiting trial for murder and well known for assaulting other medical staff at Rikers Island, without the proper restraints (he was only handcuffed from the front, without any waist or ankle shackles); (2) allowed him to roam about the mini clinic after he defiantly refused their instruction to step into the holding pen and instead told them that "[y]ou know who I am;" (3) did not remove the dangerous inmate from the mini clinic after he had already been examined by Villalobos and presumably had no further business at the mini clinic, despite Villalobos's repeated requests to do so and even after Villalobos's temporary departure from the mini clinic in protest; and (4) upon Villalobos's return, Smith and Ologun (Small had left at this point) allowed this dangerous inmate to walk into the innermost part of the mini clinic (which stored potentially dangerous medical equipment such as scalpels) where Villalobos, with his back to the door, was trying to call an administrator to remove the insufficiently restrained and supervised Rodriguez from the mini clinic.

Accordingly, at the pleading stage, the Court concludes that as to Smith, Ologun and Small, qualified immunity is not available as a basis for dismissing the claim.

   iv. <u>Section 1983 Claims Against Walker</u>

The Court concludes that Villalobos has failed to state a plausible claim to relief under section 1983 as against Walker.  Based on the Amended Complaint, Walker briefly stopped by for the first time during the hostage situation and left, without seemingly intervening herself or calling the ESU.  Her actions cannot be characterized as actively creating or increasing the danger of the hostage situation to Villalobos, which was already fully underway, nor did she communicate that Rodriguez would go unpunished for the hostage taking.  As another independently fatal failure, Villalobos has not adequately pled that Walker's actions shock the contemporary conscience, as required for a due process claim under section 1983.

Accordingly, the motions to dismiss Villalobos's section 1983 claims against the individual defendants will be denied as to Smith, Ologun and Small and granted as to Walker..

  B. <u>Negligence and Loss-of-Consortium Claims</u>

Defendants urge that the plaintiffs' state law claims are time-barred as against Walker and Ologun, who were not named as plaintiffs until the Amended Complaint was filed on August 24, 2021, more than a year and ninety days after the incident on September 24, 2019. (City Br. at 19-20, 22-23 (citing N.Y. Gen. Mun. Law 50-i).)  As to the loss-of-consortium claims, defendants argue that Martinez has failed to allege that Villalobos was physically injured during the incident as required to plausibly state a claim to relief under New York law.  (City Br. at 20-21.)

The Court concludes that the state law claims against Walker and Ologun are not time-barred and that the lack of an alleged physical injury by Villalobos does not bar Martinez's recovery on her derivative loss-of-consortium claims under New York law.

i.     Timeliness of the State Law Claims Against Walker and Ologun

Defendants argue that "[p]ursuant to New York General Municipal Law 50-i, an action must be commenced within one year and ninety days after the happening of the event on which the claim is based." (City Br. at 22.) They argue that because plaintiffs did not name Walker and Ologun by their true names, but instead as "the Warden of GRVC" and "Captain Ohagbon" until plaintiffs filed the Amended Complaint on August 24, 2021—more than a year and ninety days after September 24, 2019—the state law claims must be dismissed against both Walker and Ologun. (Id.)

Defendants' argument is misplaced. New York General Municipal Law § 50-i applies to actions against "a city, county, town, village, fire district or school district," not to claims against individual officers, such as Walker and Ologun.[3] N.Y. Gen. Mun. Law § 50-i(1) (McKinney 2019). As the defendants themselves note, "[w]hether a claim against the City is timely filed is an issue separate and apart from the timeliness of the filing as to an individual defendant." (City Reply Br. at 10.) As to the timeliness of filing a suit against an individual defendant, New York's general statute of limitations for actions seeking to recover damages for personal injury, including negligence claims and loss-of-consortium claims, is three years. N.Y.

---

[3] More fully, New York General Municipal Law § 50-i states: "(1) No action or special proceeding shall be prosecuted against a city, county, town, village, fire district or school district for personal injury, wrongful death or damage to real or personal property alleged to have been sustained by reason of the negligence or wrongful act of such city, county, town, village, fire district or school district or of any officer, agent or employee thereof . . . [unless] the action or special proceeding shall be commenced within one year and ninety days after the happening of the event upon which the claim is based." N.Y. Gen. Mun. Law § 50-I (McKinney 2019).

C.P.L.R. § 214(5) (McKinney 2021).  The Amended Complaint, with the correct names for

Walker and Ologun, was filed on August 24, 2021, within three years of September 24, 2019.

Accordingly, the Court concludes that the state claims against Walker and Ologun

are not time-barred and the motions to dismiss these claims on statute-of-limitations grounds will

be denied.

ii.     Loss-of-Consortium Claims and Allegations of Physical Injury

Defendants also argue that "Martinez cannot sustain a state law claim for loss of

consortium on behalf of Martinez because Villalobos has failed to allege a physical injury, as he

must, to allow his wife to pursue this derivative claim."  (City Br. at 20.)  However, "in New

York, a derivative claim for loss of consortium can be asserted even where the principal claim is

based on emotional rather than physical injuries."  Pratt v. Ocean Med. Care, P.C., 236 A.D.2d

380, 381 (2d Dep't 1997).  See also Garrison v. Sun Printing & Publishing Ass'n, 207 N.Y. 1, 10

(1912) ("[T]he question is presented whether a husband may recover for loss of services of his

wife caused by her sickness resulting from mental distress . . . . I recommend that the judgment

appealed from be affirmed, with costs, and the question certified to us answered in the

affirmative.").

Accordingly, the motions to dismiss Martinez's loss-of-consortium claims solely

because Villalobos has not alleged a physical injury will be denied.

CONCLUSION

After consideration of all the arguments of the parties, including those not

expressly referenced, the motions to dismiss the Amended Complaint are DENIED as to: (1) the

section 1983 claims against Smith, Ologun and Small; (2) the New York state negligence claims

against all defendants; and (3) the New York state loss-of-consortium claims against all

defendants and GRANTED as to the section 1983 claim against Walker.  The Clerk is

respectfully directed to terminate the motions (Doc 38, 41).


       SO ORDERED.


_____
P. Kevin Castel
United States District Judge

Dated:  New York, New York
       May 16, 2022